**Kimberly KOVACH, Plaintiff,**

v.

**J. W. MIDDENDORF, Secretary of the Navy, et al., Defendants.**

**Civ. A. No. 75–20.**

United States District Court,
D. Delaware.

Dec. 14, 1976.

Eugene J. Mauer, Jr., of Mekler & Maurer, Wilmington, Del., for plaintiff.

W. Laird Stabler, Jr., U. S. Atty., and Kent Walker, Asst. U. S. Atty., Wilmington, Del., for defendants; Lt. Arthur P. Leary, USNR, Washington, D.C., of counsel.

STEEL, Senior District Judge:

In this civil rights action plaintiff alleges that her equal protection rights under the Fifth Amendment have been violated by the discriminatory policy of the United States Navy in granting a disproportionately low number of NROTC four year and two year scholarships to women vis-a-vis men and in establishing disparate standards of eligibility. Plaintiff further alleges that 10 U.S.C. § 6015 which bars women from serving upon combat vessels and is the basis for the discriminating scholarship policy also establishes a constitutionally impermissible classification. The defendants are United States naval personnel who in one way or another are responsible for or have contributed to the scholarship policy of the Navy.

Plaintiff is a nineteen year old female who is currently a second year student at the University of Pennsylvania which she entered in September 1975. She was a citizen of Delaware when suit was begun. All of the defendants are citizens of states other then Delaware. The amount in controversy is in excess of $10,000, exclusive of interest and costs. Jurisdiction exists under 28 U.S.C. § 1331(a).

The case was tried to the Court without a jury.

In August 1974, when plaintiff was contemplating entering the University of Pennsylvania in September of 1975, she applied for a four year NROTC scholarship. Prior to submitting the application plaintiff had complied with all of the prerequisites set forth in the Navy-Marine Corps Scholarship Program 1973 NROTC Bulletin.

The program is one which is funded by the federal government. Under it specially selected students secure scholarships to attend specified college level institutions, the term of which can be either for two or four years. Students who complete the program are appointed Midshipmen, Naval Reserve, and are granted the compensation and benefits authorized by law during the basic course (not to exceed 20 months) and advanced course (not to exceed 20 months) for a total period of four years (40 months). During this period of college training the Navy pays for tuition, fees and text books and provides uniforms and a subsistence allowance of $100 a month. The program is maintained to educate and train well qualified young men and women for careers as commissioned officers of the regular Navy.

In November 1971, the maximum number of scholarships authorized for all persons at any one time was 6,000. In 1972 the program was opened to women. For the school year 1975–76 there were 16 four year NROTC scholarships authorized for women and 1,988 authorized for men.

Underlying the policy of the Navy in restricting the number of four year scholarships awarded to women is the fact that 10 U.S.C. § 6015 prohibits the assignment of women to combat vessels.[1]

An applicant for a four year scholarship becomes a finalist for a scholarship by achieving a certain minimum score on the Scholastic Aptitude Test (S.A.T.) administered by the Educational Testing Service. After the preliminary screening of finalists based on S.A.T. scores the selection of the recipients of the awards is made by the National Selection Board of the Naval Re-

---

1. This same limitation applies to the number of two year scholarships which will be available to women for the 1977–78 school year.

Section 6015 is discussed later in the context of its constitutionality.

cruiting Command and is based on several factors. The board considers transcripts sent by the high school, three personal character references, two interview reports by naval personnel and other miscellaneous information. The decision-making process necessarily involves subjective considerations to some extent.

Scholarships to females, for the four year program commencing in the 1975–76 school year, were awarded on a national basis whereas scholarships to males were awarded on the basis of a percentage allocation for each state. Gender is a classification on the basis of which scholarships are awarded inasmuch as the numbers to be awarded are predetermined by the Chief of Naval Personnel on a male-female basis.

Females who compete for scholarships compete only against other females. They do not compete directly against nor are they compared with male applicants by the Naval committees who perform any of the functions relating to selection of persons for scholarships.

Because of the limited number of four year scholarships available to women for the 1975–76 school year, a female applicant was required to score higher on the S.A.T. than a male applicant. The qualifying score for male applicants was a math/verbal combination on the S.A.T. of 1,000, or 23 on the American College Test (A.C.T.), and for females a 1,200 on the S.A.T. or a 27 on the A.C.T.

Plaintiff's score on the S.A.T. test taken in May 1974, was 1,150. This score would easily have qualified her as a finalist had she been a male applicant. There are males who, even though they received lower scores than plaintiff, were nevertheless awarded four year scholarships.

On November 26, 1974, plaintiff received from defendant McIntosh a letter rejecting her application. The letter stated that her "score was below that established for further consideration".[2] A male who achieved the same score would not have been so rejected.

On January 27, 1975, plaintiff filed her complaint. This prayed for an injunction directing defendants to immediately instate plaintiff as a finalist for the four year program and subsequently to consider her application in a non-discriminatory manner. It also prayed for declaratory judgment that the regulations and administration of the program were discriminatory and in violation of the Due Process Clause of the Constitution. No monetary relief was prayed for.

Because no decision in the case was rendered prior to the commencement of the 1975–76 school year it was impossible for plaintiff to to be admitted in the four year program for that year. For this reason the defendants argue that the four year aspect of the case is moot.

■ Although it is now impossible to grant plaintiff any injunctive relief for the four year program she is nonetheless entitled to a declaratory judgment as to the constitutional issue. The underlying controversy is "[one] capable of repetition yet evading review". Declaratory relief is warranted in such circumstances. *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). There plaintiffs, who were candidates for the office of presidential elector from Illinois, challenged the constitutionality of an Illinois statute which required 200 signatures from the members of each of 50 counties in order to qualify for the position. Plaintiffs sought a declaratory judgment concerning the validity of the law and injunctive relief against its enforcement. The election took place before the suit was decided and the defendants moved to dismiss the action for mootness. The three judge District Court dismissed the complaint for failure to state a cause of action but the Supreme Court reversed and said at p. 816, 89 S.Ct. at p. 1494:

> "Appellees urged in a motion to dismiss that since the November 5, 1968, election has been held, there is no possibility of

2. The four year scholarships for 1975–76 were awarded by the National Selection Board of the Naval Recruiting Command in February of 1975.

granting any relief to appellants and that the appeal should be dismissed. But while the 1968 election is over, the burden which *MacDougall v. Green, supra* [335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3], allowed to be placed on the nomination of candidates for statewide offices remains and controls future elections, as long as Illinois maintains her present system as she has done since 1935. The problem is therefore 'capable of repetition, yet evading review,' *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, [31 S.Ct. 279, 283, 55 L.Ed. 310]. The need for its resolution thus reflects a continuing controversy . . . ."

The rationale of *Moore v. Ogilvie* is applicable to the present case. There, as here, the action was an individual and not a class action. In *Ogilvie* there was no indication that the plaintiffs would again be in a position to raise the same question, nor is there any suggestion in the instant case that plaintiff will apply for a four year scholarship. Because the issue in *Ogilvie*, as here, was apt to recur with persons other than the plaintiffs and the passage of time alone would probably prevent its resolution in time for them to obtain any relief other than a declaratory judgment, the Court refused to dismiss the action upon the ground that the issue was one "capable of repetition yet evading review".

The cause of action as it relates to the four year scholarship program is not moot.

Following the rejection of plaintiff's application for the four year scholarship, plaintiff made efforts to apply for a two year scholarship to begin in September 1977. She was informed that applications are not accepted for the two year program until January 1977.[3] Plaintiff intends to apply at that time for a two year scholarship.

Anticipating that her application will be treated in the same discriminatory manner as her prior application for a four year scholarship, plaintiff filed an amended complaint on June 24, 1976. In almost all respects it is like the original complaint except that in addition to its allegations the amended complaint alleges the unconstitutionality of the two year program and of 10 U.S.C. § 6015, prays for a declaratory judgment in those respects, and for damages.

The two year program is a new one which was begun in 1975. The purpose of the program, like the four year program, is to train career unrestricted line officers for the Navy. The number of two year scholarships available is dependent upon the amount of attrition from the four year program, that is, the number of two year scholarships awarded will correspond with the number who have dropped from the four year program. The program is available to students who have completed two years of college and meet additional requirements of naval career motivation, grade point average and academic prerequisites.

For the school year 1976–77 there were authorized 232 two year scholarships for men and 18 for women. The ratio between male and female of two year scholarships that will be awarded for the school year 1977–78 will not be known until January 1977. Because of the disparity between the number of two year scholarships authorized for men and women it is reasonable to conclude that the number of scholarships which will be awarded to men for the year 1977–78 will be significantly higher than the number awarded to women. It is for this reason that plaintiff challenges the validity of the Navy's policy in administering the program as being in violation of her equal protection rights under the Due Process Clause of the Fifth Amendment.

■ Defendants argue that in both its two year and four year aspects this case presents a political and not a judicial question within the constitutional power of the Court to decide. Defendants point out that Congress alone has the power under the Constitution "[T]o provide and maintain a Navy", Art. I, § 8, Cl. 13 and "[T]o make

---

3. The reason is because the application must disclose college transcripts for at least three semesters which would not ordinarily be completed until January 1977.

Rules for the Government and Regulation of the . . . naval Forces". Art. I, § 8, Cl. 14. Defendants argue that the Constitution has placed the power exclusively in Congress to legislate and in the President to execute in all areas relating to the conduct of the Navy, and that decisional responsibilities in those areas are beyond the constitutional limits of judicial power. Defendants rely primarily upon *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953) and *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) to support this view. Neither of these cases nor the others referred to by plaintiff discuss the issue whether courts, under the power constitutionally conferred upon them, may impose restrictions upon legislative or executive decisions made in the exercise of their war powers if those decisions infringe upon constitutionally protected rights. That courts have the power to do so is settled. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 164–165, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). See *United States v. MacIntosh,* 283 U.S. 605, 622, 51 S.Ct. 570, 75 L.Ed. 1302 (1931).

This brings to the fore the constitutional question raised with respect to both the two and four year scholarships because of the disparate numbers of men and women selected·for them and the different selection standards which are applied.

The total officer strength of the Navy which Congress authorized was 63,500. During the summer of 1975 the Bureau of Naval Personnel conducted a study to determine the maximum number of unrestricted line officer billets or positions which could be filled by female unrestricted line officers.[4] The study determined that of the 63,500 total officer billets, 37,000 were designated for unrestricted line officers. The study further determined that the maximum number of female unrestricted line officers that the Navy could utilize was approximately 2,000, or about 5.4% of

the number of men which the Navy could make use of. Basically, this disparity results from the fact that under 10 U.S.C. § 6015 women are prohibited from being assigned to combat vessels which must be manned exclusively by men. Section 6015 provides with respect to women in the Navy:

" . . . [W]omen may not be assigned to duty in aircraft that are engaged in combat missions nor may they be assigned to duty on vessels of the Navy other than hospital ships and transports."

Plaintiff concedes that if this statute is constitutionally valid the difference between the treatment of women and men in the scholarship program is one that is rationally related to a governmental purpose: the provision, maintenance, government and regulation of the Navy. Doc. 49, p. 6. It is plaintiff's claim, however, that 10 U.S.C. § 6015 itself, because of its unequal treatment of men and women, establishes a classification which is constitutionally impermissible.

■ Although the Fifth Amendment does not contain an equal protection clause, it does forbid discrimination that is "so unjustifiable as to be violative of due process". *Schlesinger v. Ballard,* 419 U.S. 498, 500, 95 S.Ct. 572, 574, 42 L.Ed.2d 610 (1974); *Bolling v. Sharpe,* 347 U.S 497, 499, 74 S.Ct. 693, 98 L.Ed. 84 (1954).

■ Traditionally the courts have sustained a governmental classification if it is reasonable rather than arbitrary. See, e. g. *Jefferson v. Hackney,* 406 U.S. 535, 546, 547, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *McLaughlin v. Florida,* 379 U.S. 184, 190–191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369 (1911). This test is satisfied when the chal-

4. Unrestricted line officers fall primarily into two categories: (1) warfare specialists, such as persons trained in submarine or surface warfare, aviation and underwater demolition, and (2) non-warfare specialists or generalists. All

commands at sea require persons having warfare specialties. Of the generalists approximately 80% are women and 20% are men. No generalist is assigned a command at sea.

lenged governmental classification bears "some rational relationship to a legitimate [governmental] purpose". *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768 (1972); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Kotch v. Board of River Port Pilot Comm'rs,* 330 U.S. 552, 556–557, 67 S.Ct. 910, 91 L.Ed. 1093 (1947), or, stated a little differently, when the classification has some "reasonable basis". *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

 This traditional approach to equal protection has certain exceptions. One is when a statute effects a "fundamental interest" exemplified by a voting right, *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the right of procreation, *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), an equal right to a criminal appeal, *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and a right to interstate travel, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The test of a fundamental right is whether it is "explicitly or implicitly guaranteed by the Constitution". The right to an education, while important, is not a fundamental one. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 33–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972). Another exception is when a "suspect classification" exists, such as race, *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), *McLaughlin v. Florida,* 379 U.S. 184, 191–192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), alienage, *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and national origin, *Oyama v. California,* 332 U.S. 633, 644–646, 68 S.Ct. 269, 92 L.Ed. 249 (1948), *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

In cases involving fundamental rights or suspect classification, the government is required not merely to show that the classification bears a rational relationship to a governmental interest, but it has a heavy burden to establish that the classification is *necessary* to achieve a *compelling* state interest. See *San Antonio Independent School District v. Rodriguez, supra,* 411 U.S. 34, fn. 73, 93 S.Ct. 1278, and the article entitled "Gender and the Constitution" by Professor Ginsburg in 44 Cincinnati L.Rev. 1, 16 (1975).

Plaintiff makes no claim that any fundamental right is in issue here;[5] and obviously she has not been the subject of discrimination premised upon race, alienage or national origin. Nonetheless, plaintiff argues that the policy of the Navy to discriminate between female and male solely upon the basis of sex rather than ability is a "suspect classification" and should be tested by the more stringent standard applicable to such classifications. A majority of the Supreme Court has never gone this far,[6] although a plurality of four justices, speaking through Mr. Justice Brennan in *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) have favored placing a male-female classification in the "suspect" category.[7] Supreme Court decisions subsequent to *Frontiero* have withheld endorsing the view expressed by Mr. Justice Brennan.

In *Campbell v. Beaughler,* 519 F.2d 1307 (9th Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976), the Court was faced with the argument, based upon the reasoning of *Frontiero,* that a Marine regulation concerning hair styling which differentiated between men and women should be subject to strict scrutiny since it

---

5. Doc. 53, p. 7.

6. The plaintiff admits this (Doc. 11, p. 11).

7. That position was not adopted by a majority of the Court. Mr. Justice Rehnquist dissented on the grounds relied upon by the lower court;

Mr. Justice Stewart, citing *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) stated merely that he would reverse; and three justices expressly refused to decide whether gender is a constitutionally suspect classification.

was a classification based solely upon sex and hence was inherently suspect. The Court rejected the argument and at page 1309 said:

"Moreover, recent Supreme Court decisions [since *Frontiero*] indicate that only a rational relationship between legitimate governmental interests and the sex classification need be found. *Stanton v. Stanton,* 42[1] U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975)."[8]

Were this Court forced to choose between either the traditional or the strict scrutiny test of the classification established by section 6015 the Court would conclude that under existing law the traditional test was the proper one to apply. The decisions involving the constitutionality of the Military Selective Service Act, 50 U.S.C. App. § 451, et seq. have elected to apply this test.

In *United States v. Fallon,* 407 F.2d 621 (7th Cir. 1969), *cert. denied,* 395 U.S. 908, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969), the Court sustained the constitutionality of the Act against the contention, among others, that it violated the Due Process Clause of the Fifth Amendment in making men subject to the draft whereas women are not. The purpose of the Act, the Court said, had been declared by Congress to be that "an adequate armed strength must be achieved and maintained to insure the security of this Nation". *Fallon,* 407 F.2d at 622. The Court held that the draft classification was reasonably related to this purpose.

In *United States v. Reiser,* 532 F.2d 673 (9th Cir. 1976), the Court found a clear rational relationship between the governmental legitimate interests as expressed in the Act, and the classification by sex, and reversed the judgment below, at 394 F.Supp. 1060 (D.Mont.1975), in which the District Court by applying the strict scrutiny test had held the Act to be unconstitutional because of its exclusion of women.

See also *United States v. Cook,* 311 F.Supp. 618 (W.D.Pa.1970).

■ However, it is unnecessary for the Court to make such a choice between the traditional and strict scrutiny standard in testing the constitutionality of the section 6015 classification for under either standard the constitutionality of the statute is sustainable. In *United States v. Yingling,* 368 F.Supp. 379 (W.D.Pa.1973), the Court held that the Military Selective Service Act was not arbitrary or unreasonable under the traditional test and also that the classification was justified by a compelling governmental interest under the strict scrutiny test. The Court found the compelling governmental interest to be providing for the common defense in a manner which would both maximize the efficiency and minimize the expense of raising an army.

Thus the authorities, without exception, have upheld the constitutionality of the Military Selective Service Act despite the fact that women are excluded from its operation. In principle these authorities have four square application to the instant case. The Constitution gives the Congress broad power to provide for the national defense. In so critical an area, the Congress has a compelling state interest on which to justify the classification established by section 6015. In the absence of qualifications or limitations found in the Constitution or in applicable principles of international law (there are none in the instant case) the war power of Congress knows no bounds. *United States v. MacIntosh,* 283 U.S. 605, 622, 51 S.Ct. 570, 75 L.Ed. 1302 (1931). The Congressional classification of men and women into two categories for service upon combat vessels mandated by section 6015 violates no equal protection rights of the plaintiff and her argument to the contrary is rejected.

■ Furthermore, plaintiff has no standing to challenge the constitutionality of the two year program.

---

**8.** The Court might well have added the cases of *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974) and *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1973).

An applicant for the two year program must have either two semesters of integral calculus or one semester of integral calculus and one semester of college physics. These requirements are the same for both men and women. The calculus and physics courses must be completed by an applicant before he or she is selected in May of the year in which the applicant is to begin the program. The plaintiff has not taken and is not presently taking any courses in either physics or calculus. Plaintiff testified, however, that she will take the necessary calculus and physics courses in the 1977 spring semester. This semester will finish by approximately May 21, 1977. Plaintiff cannot complete the calculus and physics courses by the time when the selection process is completed in early May.

Because the plaintiff will not have completed any of the physics and calculus courses by the time the scholarship applicants are selected, it is unlikely that she will be chosen for that program. This is because the duties of a Navy unrestricted line officer are highly technical and hence the Navy is looking for applicants who have technical subject aptitude.

Because lack of education qualifications, without more, will probably prevent the naval authorities from giving any serious consideration to plaintiff's application, this necessitates judgment being rendered for defendants in the two year scholarship aspect of the case.

Judgment will be entered for the defendants.

The foregoing constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.